IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


STOCKDALE V. REHAL


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


APRIL STOCKDALE, APPELLEE AND CROSS-APPELLANT,

V.

DANIEL J. REHAL, APPELLANT AND CROSS-APPELLEE.


Filed April 2, 2019.    No. A-17-1221.


Appeal from the District Court for Douglas County: GARY B. RANDALL, Judge. Affirmed.

Christopher A. Vacanti, of Vacanti Shattuck, for appellant.

Adam E. Astley, of Astley Putnam, P.C., L.L.O., for appellee.


PIRTLE, BISHOP, and ARTERBURN, Judges.

BISHOP, Judge.

## I. INTRODUCTION

In this paternity action, the district court for Douglas County awarded Daniel J. Rehal and April Stockdale joint legal and physical custody of their son. When unable to agree on decisions regarding their son, Daniel was granted final say on matters related to the child's education and religion, while April was granted final say on medical issues affecting the child. Daniel was ordered to pay child support.

Daniel appeals, challenging the district court's decision to award April final decisionmaking authority on medical issues, and its determination of his earning capacity for purposes of calculating child support. April cross-appeals, challenging the district court's decision not to award her a retroactive adjustment in child support to the effective date of the temporary order and challenging the court's award of Sunday and holiday parenting time. We affirm.

- 1 -

## II. BACKGROUND

Daniel (age 47 at trial) and April (age 38 at trial) are the parents of Luke Rehal, born in 2012. Daniel and April were never married.

On May 5, 2015, April filed a complaint to establish paternity, custody, and child support, alleging that Daniel was Luke's father. She asserted that she and Daniel both resided with Luke until 1 year prior to the filing, and that for the year leading up to the filing the parties had been sharing custody of Luke but that arrangement was no longer in Luke's best interests. April sought "sole temporary and permanent care, custody and control" of Luke, subject to Daniel's "reasonable and specific parenting time." She also sought a "reasonable amount" of temporary and permanent child support. On June 2, April filed a motion for temporary orders regarding custody and support.

In his answer and counterclaim, Daniel admitted he was Luke's father. However, Daniel sought joint physical custody of Luke, and asked the district court to award him sole legal custody. Daniel also filed a motion for temporary custody (joint physical, sole legal) and asked that child support be calculated according to the Nebraska Child Support Guidelines using a joint custody calculation.

In its temporary order filed on September 18, 2015, the district court awarded the parties joint legal and physical custody of Luke; the parties were to follow a "7-on-7-off" parenting schedule with transitions occurring Sundays at 5 p.m. Daniel was ordered to pay child support in the amount of $400 per month. Daycare, medical expenses, and all "direct costs" incurred exclusively for Luke were to be paid 60 percent by Daniel and 40 percent by April. The parties were ordered to "meet and confer to decide upon a mutually agreeable pediatrician for the child" and neither party was to make healthcare appointments for the child without providing notice to the other party and coordinating the appointment so that the other party could attend if they chose to do so.

More than a year after the entry of the temporary order, Daniel filed a motion and affidavit for an order to show cause on February 3, 2017. He alleged that since the entry of the temporary order, April failed and refused to (1) reimburse her 40-percent share of Luke's child care, medical, and direct costs (April's alleged obligation was "at least" $3,755), (2) meet and confer to decide upon a mutually agreeable pediatrician, and (3) coordinate Luke's healthcare appointments with Daniel or provide notice to him. On February 3, the district court issued an order directing April to appear and show cause why she should not be found in contempt for failing to comply with the court order. The show cause contempt matter was set for hearing the same day as trial.

Trial took place over 3 days in February 2017. Although other witnesses were called to testify, the only witness testimony relevant to this appeal is that of Daniel and April. The relevant evidence will be discussed as necessary later in this opinion.

On September 15, 2017, the district court filed its decree of paternity. The court stated, "[I]t is difficult to decide a case when the [c]ourt found the actions of both parties to be outrageous, narcissistic and based solely in power controlled issues." "This case after the presentation of days of evidence numbering over 1900 pages and tens of thousands of dollars of expense for the parties and the State of Nebraska has done little to nothing to establish a firmer basis for providing for the welfare of the child." The court awarded the parties joint legal and physical custody of Luke and established a parenting time schedule. The court found that joint custody would be in the best

interests of Luke because "the parties have been able to work together when required during the temporary period, and it has become eminently clear to the court that should either party be granted sole custody of the child that parent would use it against the other, to the detriment of the child." Although the parties were awarded joint legal custody, the court recognized that the parties may not always be able to reach an agreement on issues affecting Luke and it therefore granted April final decisionmaking authority on any medical issues, and Daniel was granted final decisionmaking authority for Luke's education and religion. The court attributed an earning capacity of $200,000 gross per year to Daniel and ordered him to pay $906 per month for child support, commencing on September 1. The court did not find April in contempt, but did order her to pay Daniel $3,755 in expenses per the terms of the temporary order.

Both parties filed motions to alter or amend the judgment. As relevant to this appeal, April alleged that the change in child support should be made retroactive to July 1, 2015 (the start date under the temporary order). She also sought changes to the Sunday and holiday parenting time. In his motion, Daniel asked the district court to award him final decisionmaking authority on any medical issues and for a "correction" to his child support obligation based on the 2015 income information presented to the court (the district court had originally found that after 2014 Daniel offered no further evidence that it could rely on). In its order on the motions to alter or amend, the district court altered the Sunday parenting time schedule. Additionally, the court still determined Daniel's earning capacity was $200,000 gross per year, but "deleted" other language regarding its findings; the court ordered Daniel's counsel to "prepare a Nunc Pro Tunc Decree of Paternity deleting the language referenced herein." The parties' remaining requests were denied. A nunc pro tunc decree of paternity was subsequently filed.

Daniel timely appeals, and April cross-appeals.

### III. ASSIGNMENTS OF ERROR

Daniel assigns that the district court erred in (1) granting April the final determination on Luke's medical care and (2) its child support award.

April assigns, on cross-appeal, consolidated and restated, that the district court erred in (1) failing to retroactively adjust Daniel's child support obligation to the effective date of the temporary order and (2) its allocation of Sunday and holiday parenting time.

### IV. STANDARD OF REVIEW

Domestic matters such as child support are entrusted to the discretion of trial courts. See *Anderson v. Anderson*, 290 Neb. 530, 861 N.W.2d 113 (2015). An appellate court reviews a trial court's determinations on such issues de novo on the record to determine whether the trial judge abused his or her discretion. *Id.* Under this standard, an appellate court conducts its own appraisal of the record to determine whether the trial court's judgments are untenable such as to have denied justice. *Id.*

Child custody determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *State on behalf of Maddox S. v. Matthew E.*, 23 Neb. App. 500, 873 N.W.2d 208 (2016).

Parenting time determinations are also matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *Id*.

In child custody cases, where the credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Id*.

## V. ANALYSIS

### 1. DANIEL'S APPEAL

#### (a) Medical Decisionmaking Authority

##### *(i) Evidence From Trial*

The testimony from trial reveals the parties clearly have significant disagreement on medical matters for Luke. Daniel generally believes that Luke is healthy, and April does not. At trial, Daniel acknowledged that part of his concern with April having control of Luke's medical needs is that she takes him into the doctor unnecessarily and Daniel felt that Luke was being overprescribed medication. Daniel testified that Luke is "now resistant to amoxicillin as well as Zithromax, which are two mainstream antibiotics." However, April testified that Luke has never been tested for resistance to any antibiotics and she has never been told by medical professionals that Luke is resistant to certain antibiotics; she said that Daniel has told her that Luke is resistant.

The two main areas of contention among the parties at trial was whether Luke should have surgery to remove his tonsils and whether he was getting timely vaccines.

##### a. Tonsils

April testified Luke was a "fairly healthy newborn" until April 2013 when "he started frequently getting sick." "More sinusitis, coughs, respiratory illnesses, ear infections. And then we started getting more acute pharyngitis, tonsillitis, strep throat." It was discussed with Luke's pediatrician "fairly early on" that in the future this may be something that needs to be addressed.

April testified that Luke was referred to Dr. Ryan Sewell, an ENT, in April 2014. She said surgery was ordered on March 20, 2015. "We left the office with the surgery ordered, and we were to make a decision as parents as to whether to have a full tonsillectomy and adenoidectomy or a partial tonsillectomy and adenoidectomy. That's the only decision we were supposed to be making." Daniel claimed that surgery was never ordered and that he did not agree with surgery. According to April, "This became very contentious. And then [Daniel] demanded a sleep study, even though the doctor didn't feel the need to have one done because he then believed that the surgery was ordered only because of what I had said were symptoms." "By email," Daniel "told me he has saved Luke from death by preventing the surgery." When asked what risk Daniel had expressed to her of the potential downside of having the surgery, April responded, "Well, he has said in numerous doctors' appointments that there's a 1 to 5 percent risk of bleed out." According to April, because the parties have joint legal custody, if she wants Luke to have surgery but Daniel says no, then the surgery does not happen.

According to April, Dr. Sewell recommended surgery to remove Luke's tonsils and adenoids. However, Daniel insisted on a sleep study. The sleep study showed no sleep apnea, but

the study said there may have been an underestimation of obstruction. The parties also took Luke to Dr. William Ingram and Dr. Elise Allen for second and third opinions regarding surgery. In his November 2015 letter to Dr. Sewell (found in in exhibit 21), Dr. Ingram stated, "Because of the difference of opinion between his Mom and Dad, watchful waiting is the wisest option"; he also stated a second sleep study is reasonable. In her December letter to Luke's pediatrician (found in exhibit 20), Dr. Allen noted the parents' "very different opinions on the procedure." Dr. Allen offered three options: (1) continued watchful waiting with no other medical management, (2) watchful waiting with the addition of Singulair to Luke's current nasal steroid, or (3) proceeding with an intracapsular tonsillectomy and adenoidectomy which "would limit the bleeding risk that dad is concerned about and could get an improved nighttime airway which would be helpful in mom's opinion."

Exhibit 32 contains a medical notation from Dr. Sewell dated December 29, 2016, for his nurse to call Luke's family. The note states in relevant part:

> Mother has been in touch with our social worker regarding Luke and his tonsils. I have reviewed the documentation provided by mom. There is no doubt he has large tonsils. The guidelines mom cites in email though require tonsillitis, not tonsillar hypertrophy. From my count he had three episodes this year (2016) including the most recent one, 2-3 in 2015, and 5 in 2014. I would say that puts him right at the minimum for tonsillectomy/adenoidectomy. As I have said before, I feel he would do better with his tonsils removed.

> Ultimately I would be happy to see them back in clinic to review. My question for mom would be how does dad feel about tonsillectomy? Ultimately I can only make a recommendation. They have to make that decision together.

An appointment was scheduled for "2/17" to review and discuss surgery. At trial, April testified that Dr. Sewell had an emergency and had to cancel the February appointment. She said the appointment has not been rescheduled because "[Daniel] recorded a conversation with Dr. Sewell and now has a recorded conversation with the nurse, and they now want all communications to go through their legal department."

Daniel testified that April often made up symptoms in order to meet the requirements to get Luke's tonsils removed. Daniel also believed a second sleep study should be performed before any decision on surgery was made. However, April testified that a second sleep study was expensive and not necessary, given that Dr. Sewell thought Luke would do better with surgery and a second sleep study or a "wait and see" approach were only recommended because the parties could not agree on surgery.

b. Vaccinations

The parties' other main point of contention concerned vaccinations. Daniel claimed that April failed to timely vaccinate Luke. Daniel testified that April's position regarding vaccinations was "irregular" in that "[s]ometimes she would be in favor, depending upon her mood, and other times she would just be completely resistant and refuse in the doctor's office[.]"

April testified that Luke's MMR vaccine was delayed because he had been ill so much that he had not had a well-child check. On January 31, 2015, "[Daniel] took [Luke] to get an MMR

shot without telling me he was making an appointment." On February 1, "I received an e-mail from [Daniel] stating that he was going to be excluding me from Luke's medical care; that he was going to be handling his medical care without my involvement." April said that Daniel has created disputes about the timing of the vaccines. With the MMR shot and that email, "[Daniel] accuses me of being anti-vaccine, . . . well, I think that was really the premise, that I wasn't able to make medical decisions because I didn't believe in vaccines, which that's not the case." April testified that she is not opposed to vaccinations and that her oldest son (from a previous marriage) is "fully vaccinated." She said Luke had been vaccinated while in her care and that he only has one more vaccination to do before he starts kindergarten. April stated:

> The only issue I have ever had with a vaccination is I would like to give the live vaccine separately just because I am concerned about bombarding the immune system. So what that means like the varicella, which is chicken pox, and the MMR vaccine, I would just prefer not to give them with the DTaP, and you know, all the other ones at the same time. Luke's pediatrician was just respectful of that. But other than that, no, both of my children are vaccinated.

April also stated that Luke had been "frequently ill" and "it's kind of common knowledge that you don't inoculate a child when their immune system is already fighting something. So they have been delayed in some cases."

### c. Other Medical Disagreements

Daniel claims that April refused to confer and agree on a pediatrician despite a court order requiring her to do so. April testified that Daniel initially agreed to have Dr. Katherine Anglim be Luke's physician, but after the legal proceedings commenced, he expressed dissatisfaction with Dr. Anglim. In the temporary order, the district court ordered the parties to meet, confer, and pick a pediatrician. April said that Daniel recommended those with whom he has some kind of personal connection, but she wanted to find someone who was "neutral." Exhibit 35 contains numerous emails between the parties beginning on September 27, 2015, wherein they discuss and suggest various pediatricians, but with no agreement; finally, in an email dated February 9, 2016, Daniel wrote, "At this point nothing has been decided between us so we will remain . . . with Dr. Anglim as his pediatrician and Dr. Sewell as his pediatric ENT." Exhibit 36 contains a text message from September 14 which again reiterates that the parties had both agreed on Dr. Anglim as Luke's primary pediatrician until trial. However, in February 2017, in his motion and affidavit for an order to show cause, Daniel claimed April was in contempt for failing to meet and confer to decide upon a mutually agreeable pediatrician for Luke.

Daniel also claims that April did not notify him of all of Luke's medical appointments. April testified that she started taking Luke to the chiropractor as an infant when the parties lived together and that Daniel never went to the appointments. In the September 2015 temporary order, the parties were ordered not to make healthcare appointments for Luke without providing notice to the other party, and coordinating the appointment so that the other party could attend if they chose to do so. Daniel claimed that April continued to take Luke to the chiropractor without notifying him. However, April testified that those appointments were either for herself or for her older child, and that while they were there, Luke was scanned and adjusted. April did not notify

Daniel in advance because "[i]t wasn't Luke's appointment," the appointments were for her and her older son and a quick decision regarding Luke was made during the appointments; April did not know Luke was going to be adjusted in advance.

They have further disagreements regarding a mole on Luke's foot, whether Luke is supposed to avoid all dairy or just cow's milk, and the fact that April gave Luke Olive Leaf Extract in his bottles when he was younger. We will not get into the minutiae of the record on these issues, other than to note that we have reviewed the entire record.

### (ii) District Court's Ruling

The district court stated:

Each party tends to blame the other for the multiple issues raised at trial, however, the Court finds neither party to be more credible than the other but merely self-centered, acting solely in their own interests and then attempting to wrap the concern for their child and his well-being into the justification of their personally unacceptable behavior.

"Both parties have exhibited controlling behavior concerning Luke's medical care, education and religious upbringing. Each party has treated the other with great disrespect which ultimately harms their child and neither will be rewarded for this behavior." The court found that joint custody would be in the best interests of Luke because "the parties have been able to work together when required during the temporary period, and it has become eminently clear to the court that should either party be granted sole custody of the child that parent would use it against the other, to the detriment of the child." Although the parties were awarded joint legal custody of Luke, the court recognized that the parties may not always be able to reach an agreement on issues affecting Luke. The district court therefore granted April final decisionmaking authority on any medical issues, and Daniel was granted final decisionmaking authority for Luke's education and religion. The district court found that "[Daniel's] refusal to allow necessary medical care for his child, which was recommended by the physician[,] placing the child at risk in this Court's opinion was less about his concern for the child and more about intentionally frustrating [April]."

### (iii) Was There Abuse of Discretion?

Daniel argues the district court should have awarded final medical decisionmaking authority to him instead of April because "April was the parent who refused to provide for Luke's medical care" by refusing to authorize a second sleep study before subjecting Luke to a surgery on his tonsils, refusing vaccinations for 18 months, putting Olive Leaf Extract in Luke's baby bottle without agreement or authorization from Luke's pediatrician, refusing to confer and agree on a pediatrician despite a court order requiring her to do so, and regularly failing to notify Daniel of Luke's medical appointments. Brief for appellant at 14.

The instant case is reminiscent of *State on behalf of Maddox S. v. Matthew E.*, 23 Neb. App. 500, 518, 873 N.W.2d 208, 219 (2016), wherein this court said, the "division of final say allows both parties to assume a primary role in decisionmaking for [the child] and avoids favoring one parent over the other, or giving one parent all the control over the other, which the district court clearly sought to avoid." Based on the record before us, we cannot say the district court abused its discretion in awarding final medical decisionmaking authority to April. The parties

clearly had disagreements over Luke's medical care. They saw three ENT's and had a sleep study in order to determine whether surgery on Luke's tonsils was warranted, yet the parties could still not agree and the surgery was not performed. Dr. Sewell felt that Luke would do better with surgery, and that could only be accomplished by awarding April final say on Luke's medical care. Further, April's decisions regarding vaccinations or other issues raised by Daniel lack the significant evidentiary weight necessary to overcome the discretion afforded the district court in making this decision. Because we find no abuse of discretion, we affirm the district court's decision to award April final decisionmaking authority on Luke's medical issues.

(b) Daniel's Earning Capacity

Daniel contends the district court erred in attributing an earning capacity of $200,000 per year to him; he claims his earning capacity is only $80,000 per year.

*(i) Evidence From Trial*

Daniel testified that he has a Bachelor of Science degree in "chemistry and business" and has an MBA. He owns a company called Vision2Voice, a health care education company that "work[s] with pharmaceutical, biotech, and biological companies" and "conduct[s] peer-to-peer education." Daniel said:

[O]ur business is broken into three areas, but part of what we do is do mandated FDA or Office of Inspector General-mandated training for health care professionals in order for them to be consultants on behalf of technology, biotech, pharmaceutical, medical device companies.

And the other half of the business is we help to do national promotion. So we will do . . . national satellite broadcasts, web events, where we work with the FDA to approve medical content. And once that content is approved, we will then take it and find ways to distribute it to health care professionals so they can, you know, continue on with their education.

Daniel had 13 employees in his company and has offices in Omaha and Chicago (opened in 2014). Daniel testified that he lost his largest client in 2014 because that client was trying to become a global company. The loss of that client affected the income of Daniel's company. Daniel said there was more than one component that affected the company's income. He testified:

I had never been in an agency. Since the beginning, right out of college, I worked for pharmaceutical companies. I didn't know how agencies operated. And I've been on the board of trustees with the Business Ethics Alliance here in Omaha for several years, and I had vowed with the organization -- one of the leaders of the organization to change our business practice in a way that was highly transparent.

Prior to this time, you'll see in 2011, 2012, it appeared that I had great profits. But what we were doing -- because I didn't know how to run an agency, and I had -- there were three of us, is I would charge $200,000 for a project and we would bill that in full. I didn't realize that -- over time I learned that we -- and we're the only agency to do this is we now provide passthrough expenses and we only charge our clients for passthrough and then hours of employees. So that -- all of [a] sudden that $200,000 project now we may only

- 8 -

bill out at 120,000 based on the hours worked. So all of [a] sudden the profit of the organization has dropped.

Now, we were awarded the Integrity Award by the Better Business Bureau. We're the only medical communications agency to have receive [sic] that. And I think that's a great thing. But our business practices have changed which is -- makes our income significantly more challenging.

April testified about Daniel's income. She agreed when her attorney asked if they took the deposition of Daniel's business manager and asked him to produce W-2's, K-1's, and 1099's. Exhibit 11 contains the requested documents and a spreadsheet April's attorney made showing Daniel's income from the figures in those documents. The Schedule K-1 forms are titled "Shareholder's Share of Income, Deduction, Credits, etc."; Vision2Voice is named as the "Corporation" and Daniel is named as the "Shareholder" on the form. The 1099 forms are titled "Miscellaneous Income"; Vision2Voice is named as the "Payer" and Daniel is named as the "Recipient." The spreadsheet in exhibit 11 shows the following. For 2011, a total income of $1,620,479 (W-2 salary of $148,479 + K-1 Distribution of $828,000 + 1099 nonemployee compensation of $644,000). For 2012, a total income of $754,711 (W-2 salary of $175,010 + K-1 Distribution of $303,761 + 1099 nonemployee compensation of $276,000). For 2013, a total income of $283,418 (W-2 salary of $61,179 + K-1 Distribution of $122,239 + 1099 nonemployee compensation of $100,000). For 2014, a total income of $217,073 (W-2 salary of $61,033 + K-1 Distribution of $156,040 + 1099 nonemployee compensation of unknown). For 2015, a total income of $60,518 (W-2 salary of $60,518 + K-1 Distribution of unknown + 1099 nonemployee compensation of unknown). For 2016, all information was unknown. The spreadsheet stated that the average from 2011-14 was $718,935, and the average from 2013-14 was $250,246.

April's testimony linked Daniel's income to important events in their lives: He earned approximately $1.6 million in 2011 (met Daniel December 2010, moved in together November 2011), $754,000 in 2012 (year Luke was born), $283,000 in 2013 (year Daniel knew April was planning to leave), and $217,000 in 2014 (year April moved out). April saw documentation that Daniel earned $60,000 in 2015 (year this paternity action was filed). April testified that Daniel knew she was planning to leave in 2013, but she ultimately continued to live with Daniel until May 2014.

According to April, Daniel also owns a building that he rents out, and she claims that his 5-year rental income average (2011-15) was $32,777. However, Daniel testified that his income on the rental property has gone down in the last couple years because a tenant moved out because it needed more space than Daniel could accommodate; a small tenant then came in and there is still a vacant spot that had been on the market for 2 years.

Daniel testified that the information in exhibit 11 (relied on by April) is "very flawed." The nonemployee compensation information was created by Daniel's business manager and was provided to April's lawyer through a request made to Daniel's company when April's counsel deposed the business manager; the document was not prepared by an accountant or a tax professional for tax returns. When asked why the business manager created the documents, Daniel said:

- 9 -

Well, as part of the subpoena, he believed he needed -- and we tried to keep a firewall between what he was doing and what I knew, since this was about me. But he was trying to check the boxes and fill the requests. And instead of calling the CPA, he went into our accounting system and tried to find information and he remanufactured this, not understanding that -- not understanding accounting. He's not an accountant. He actually ran a warehouse before I hired him. But I don't have an actual accountant that works for me. So he did his best, but he wasn't quite aware of what he was doing with this.

According to Daniel, the documents gave the appearance that he earned a lot more money than he actually did. But Daniel stated his tax returns prepared by his CPA were accurate.

Daniel's individual tax returns show the following. For 2011 (exhibit 5), an adjusted gross income of $1,092,172 (this included "wages, salaries, tips, etc." of $148,479 and $931,902 from "rental real estate, royalties, partnerships, S corporations, trusts, etc." The $931,902 was comprised of $40,213 from rental real estate and royalties plus $891,689 from S Corporation income--Vision2Voice.) Daniel claimed $153,145 in itemized deductions in 2011. For 2012 (exhibit 6), an adjusted gross income of $347,214 (this included "wages, salaries, tips, etc." of $175,010 and $163,529 from "rental real estate, royalties, partnerships, S corporations, trusts, etc." The $163,529 was comprised of $32,839 from rental real estate and royalties plus $130,690 from S Corporation income--Vision2Voice.) Daniel claimed $99,390 in itemized deductions in 2012. For 2013 (exhibit 7), an adjusted gross income of $507,024 (this included "wages, salaries, tips, etc." of $61,179 plus $388,334 from "rental real estate, royalties, partnerships, S corporations, trusts, etc." The $388,334 was comprised of $20,048 from rental real estate and royalties plus $368,286 from S Corporation income--Vision2Voice.) Daniel claimed $50,986 in itemized deductions in 2013. For 2014 (exhibit 8), an adjusted gross income of $64,671 (this included "wages, salaries, tips, etc." of $61,033; there was a loss of $35,379 from "rental real estate, royalties, partnerships, S corporations, trusts, etc." The loss of $35,379 was comprised of $9,709 earnings from rental real estate and royalties and a loss of $45,088 from S Corporation income--Vision2Voice.) Daniel claimed $47,198 in itemized deductions in 2014. (2014 was the year he lost largest client.) For 2015 (exhibit 9), an adjusted gross income of $34,237 (this included "wages, salaries, tips, etc." of $60,518; there was a loss of $58,705 from "rental real estate, royalties, partnerships, S corporations, trusts, etc." The loss of $58,705 was comprised of a loss of $2,959 from rental real estate and royalties and a loss of $55,746 from S Corporation income--Vision2Voice.) Daniel claimed $69,941 in itemized deductions in 2015. For 2016 (exhibit 106), his paystub from Vision2Voice dated December 30, 2016, shows that his gross year to date earnings as of the pay period ending December 25 were $79,999.92.

When asked if he foresaw a significant changes in his income for 2017, Daniel responded, "That's hard for me to answer because we have the lowest projections of sales on our books than we've ever had in our nine-year history. We're in a difficult position with the business. And if anybody takes a cut in pay it would be me." When asked if he had done anything intentionally to try and sabotage his income to lower the financial responsibility he had for his children, Daniel responded, "No."

On cross-examination, Daniel affirmed that the K-1's and W-2's provided were accurate. And the following colloquy was had between April's attorney and Daniel:

Q. [W]e issued a 30(b)(6) subpoena, and we asked for your company to produce one or more officers, directors, or managing agents, except you, to be examined concerning the company's financials, your compensation, your work responsibilities, and staffing changes after January 1, 2015. You remember that, don't you?

A. Yes.

Q. And your company elected to produce Scott Atkins who it employs as your business manager?

A. Yes.

Q. Mr. Atkins appeared for a deposition at [your attorney's] office, didn't he?

A. He did.

Q. And he affirmed at that deposition that besides you that he is the most knowledgeable person about the subject matter of that deposition?

A. Yes.

Q. Now, you keep the company books. You're the accountant for the company; is that right?

A. No.

Q. Mr. Atkins said that you were the company's accountant, though, didn't he?

A. I don't know, but we have an outside accountant, a CPA.

Q. Okay. Internally you use a QuickBooks or a similar program?

A. Yes.

Q. You and Mr. Atkins both have access to those?

A. Yes, that's true.

Q. And we are concerned in that deposition about finding indicators of reliability associated with those company books. You remember that, don't you?

A. Yes.

Q. Mr. Atkins indicated that he is the one who posts the transactions and reconciles the transactions with the bank account. . . .

. . . .

A. If he said that, it's not true. But go ahead.

. . . .

Q. Mr. Atkins brought in printed 1099s that he said he printed off of your system?

A. Yes.

Q. And those are the same 1099s that I included in our exhibit for your income which you disputed yesterday.

A. Yes.

Q. He said that I would have to ask you about the business logic that went into those 1099s. He didn't know anything about that.

. . . .

Q. I asked you in your deposition about those 1099s, and you reaffirmed the numbers that were printed on the 1099s; is that right?

A. I was confused and I explained my confusion during that deposition . . . .

Q. Well, you reaffirmed numbers, but you indicated that you had recently learned from your accountant that you have been doing it incorrectly?

A. Yes.

Q. And that you were making corrections?

A. Correct.

Q. But you still haven't provided . . . me with a corrected 1099?

A. Okay.

Q. And you reaffirmed during the deposition that the amounts shown on the 1099s were correctly printed, although you claim that they were erroneously filed. Is that fair?

A. Yes.

Counsel's questioning then went on to point out that Daniel claimed itemized deductions in his tax returns but had not included his Schedule A's; thus Daniel had not produced his full tax returns.

April testified that Daniel "has the capability to change his income on a whim because he's the owner of the company and really the only one who has full -- full realization of what the financials are." She said there had been situations in the past where Daniel had actually changed his income. For example, "[w]hen we were looking for a home, he told me he would just raise his income so he could get the kind of home he was hoping for."

During his testimony, Daniel acknowledged that: his home is worth approximately $427,000 and he has a mortgage of approximately $200,000; he paid approximately $600,000 for his business building and has a mortgage of approximately $290,000; he had $200,000 in liquid assets, which included cash and securities; he had another non-liquid asset, Nevada Organic, that he did not know what it was worth, but the initial cash inlay into that was $130,000; he owns Vision2Voice; and he had approximately $1.3 million in various IRAs or 401(k)s.

*(ii) District Court's Ruling*

The district court ultimately stated, "Daniel's earning capacity is determined to be $200,000 gross per year and the Court determines this is reasonable considering all evidence adduced."

*(iii) Was There Abuse of Discretion?*

Daniel argues the district court erred in attributing an earning capacity of $200,000 per year to him, and he claims his earning capacity is only $80,000 per year. No one disputes the yearly income attributed to April, which was $40,000 per year.

In general, child support payments should be set according to the Nebraska Child Support Guidelines. The guidelines provide that "[i]f applicable, earning capacity may be considered in lieu of a parent's actual, present income and may include factors such as work history, education, occupational skills, and job opportunities. Earning capacity is not limited to wage-earning capacity, but includes moneys available from all sources." Use of earning capacity to calculate child support is useful "when it appears that the parent is capable of earning more income than is presently being earned."

*Freeman v. Groskopf*, 286 Neb. 713, 720, 838 N.W.2d 300, 307 (2013). See, also, Neb. Ct. R. § 4-204 (rev. 2015). Additionally, the Nebraska Child Support Guidelines provide that in the event of substantial fluctuations of annual earnings of either party during the immediate past 3 years, the

income may be averaged to determine the percent contribution of each parent. See Neb. Ct. R. ch. 4, art. 2, worksheet 1, fn.5 (rev. 2015). In *Gress v. Gress*, 274 Neb. 686, 743 N.W.2d 67 (2007), the Supreme Court discussed at length the number of years that a court should use when averaging income pursuant to the Nebraska Child Support Guidelines and concluded that a 3-year average tended to be the most common approach in cases where a parent's income fluctuates.

Although Daniel provided his individual tax returns for 2011 to 2015, he did not provide the full returns because he did not include the Schedule A's (itemized deductions). Nevertheless, based on his tax returns his 3-year average adjusted gross income (which also matched his total income from line 22 on his federal 1040) for 2013-15 was $201,977; 2015 was the last year for which Daniel had a tax return, for 2016 he only had his pay stub which would not necessarily be reflective of all of his income (e.g., any income from "rental real estate, royalties, partnerships, S corporations, trusts, etc."). Based on our de novo review of the record, we find there was sufficient evidence to support the district court's determination that Daniel's earning capacity was $200,000 gross per year. We find no abuse of discretion by the district court in its determination of Daniel's earning capacity.

## 2. APRIL'S CROSS-APPEAL

### (a) Retroactivity of Child Support

In its September 2015 temporary order, the district court ordered Daniel to pay $400 per month in child support commencing July 1; at the time of the temporary order, the district court attributed an income of $80,000 per year to Daniel. After trial, the district court determined Daniel's earning capacity to be $200,000 per year and ordered Daniel to pay child support of $906 per month beginning on September 1, 2017. In her motion to alter or amend judgment, April argued the district court should have retroactively adjusted Daniel's child support obligation to the effective date of the temporary order because "the Court's findings at trial for the parties' incomes are the same figures [April] proffered at the time of the Temporary hearing." In her motion, she referenced exhibit 67 (received into evidence at trial), which was her June 2015 affidavit in support of her motion for temporary orders wherein she stated "I am unsure of Daniel's actual earnings, however I will find this out during discovery," but "[i]t is my understanding that he made nearly $1,000,000 in 2011 or 2012" and "[i]t would be a very conservative estimate to assume that [Daniel] currently makes not less than $200,000 per year." Without explaining its reason, the district court denied April's request to retroactively adjust Daniel's temporary child support obligation.

Temporary orders of alimony and child support are not appealable until the appeal from the final order. See *Furstenfeld v. Pepin*, 23 Neb. App. 673, 875 N.W.2d 468 (2016). See, also, *Jessen v. Jessen*, 259 Neb. 644, 611 N.W.2d 834 (2000) (challenge to award of temporary alimony is to be brought at same time as appeal of decree of dissolution); *Kosiske v. Kosiske*, 8 Neb. App. 694, 600 N.W.2d 840 (1999) (temporary child support and alimony obligations are not final and appealable at time entered, but become final upon entry of decree dissolving parties' marriage). But, see, *Berg v. Berg*, 238 Neb. 527, 471 N.W.2d 435 (1991) (child support payments are vested right of payee as they accrue; court may not forgive or modify past-due child support, but may modify amount of child support becoming due in future); *Dartmann v. Dartmann*, 14 Neb. App. 864, 717 N.W.2d 519 (2006) (Neb. Rev. Stat. § 42-369(4) (Reissue 2004) provides that temporary

or permanent support or alimony orders have force and effect of judgments when entered; thus, child support payments become vested right of payee as they accrue and district court may not forgive or modify past-due child support). See, also, *State on behalf of Pathammavong v. Pathammavong*, 268 Neb. 1, 679 N.W.2d 749 (2004) (issue of ex parte temporary custody order only relevant from time it was ordered until it was replaced by order determining permanent custody; therefore, issues pertaining to temporary order were moot and did not need to be addressed on appeal).

The above-noted cases provide that in some instances, matters contained in a temporary order may become moot upon the entry of a final order, such as a temporary custody decision. See *State on behalf of Pathammavong v. Pathammavong, supra.* However, in matters related to temporary child or spousal support, mootness may not be an issue, but past-due support already ordered is deemed vested in the payee as it accrues and may not be forgiven or modified. See *Dartmann v. Dartmann, supra.* In the present matter, April did not seek to divest herself of any past child support amounts which had already accrued under the temporary order; rather, she sought to retroactively increase or supplement the amount of temporary child support she claims she should have been paid during the "26 months" the matter remained pending. Since we do not allow appeals from temporary support orders, as set forth above, this is her first opportunity to challenge the amount of temporary child support ordered. April also points out that "the Nebraska Supreme Court recently suggested in *Onstot v. Onstot*, 298 Neb. 897[, 906 N.W.2d 300] (2018), that awards for temporary support are subject to appellate review if a proper record is prepared, including a copy of the Affidavit that was offered at the Temporary Hearing." Brief of appellee on cross-appeal at 32.

In *Onstot v. Onstot, supra*, the husband was ordered to pay a higher rate of temporary spousal support ($1,500 per month) than he was ultimately ordered to pay in permanent spousal support ($700 per month). After the final decree was entered, the husband challenged, among other issues, the award of temporary spousal support. In addressing the husband's challenge to the award of temporary spousal support, the Nebraska Supreme Court did not reach the issue of whether a temporary spousal support order could be later reduced or modified after those amounts had already accrued and vested in the payee. Rather, the Supreme Court concluded the record on appeal did not contain any bill of exceptions in regard to the hearing for temporary spousal support, but did note that the transcript contained a document entitled "Affidavit in Support of Application to Re-Set Support" that was filed with the district court. The Supreme Court said, "[W]e have no record that the 'Affidavit in Support of Application to Re-Set Support' was received at any pretrial hearing. Whether the district court reviewed the affidavit or any evidence for purposes of [the husband's] pretrial application to reset spousal support is unknown." *Onstot v. Onstot*, 298 Neb. at 905, 906 N.W.2d at 307. Accordingly, the Nebraska Supreme Court decided it would not consider the alleged error because it did not have the benefit of a proper record.

In the present matter, April contends "the temporary Affidavits are a part of the record," and therefore this court can review the temporary child support order. Brief of appellee on cross-appeal at 32. April contends the failure to retroactively adjust the child support obligation was error "because the evidence before the Court at that time was sufficient to justify the award, and because the finding at trial effectively validated the claims made at the time of the Temporary

- 14 -

Hearing." *Id*. at 31. In response, Daniel simply maintains his position that the district court erred when it found his earning capacity to be $200,000 rather than $80,000.

There is no record of what may have been discussed at the temporary hearing, or whether it was held on or off the record. It is true that April's June 2015 temporary affidavit was received into evidence at trial, and was therefore available for the district court's consideration of April's motion to alter or amend judgment. Although we do not know the district court's reasoning as to why it decided against adjusting or increasing the temporary child support given the much lower earning capacity attributed to Daniel at the time of the temporary hearing, the absence of any findings on this issue is not of particular consequence in light of our de novo review for an abuse of discretion on matters related to child support. Further, in the absence of a request by a party for specific findings, a trial court is not required to make detailed findings of fact and need only make its findings generally for the prevailing party. *Schroeder v. Schroeder*, 26 Neb. App. 227, 918 N.W.2d 323 (2018).

In our de novo review of the record, we cannot say the district court abused its discretion by declining to retroactively increase Daniel's child support obligation. Even though the district court ultimately attributed an earning capacity of $200,000 per year to Daniel, which we found consistent with a 3-year average of his adjusted gross income from 2013-15, there was also evidence that Daniel's income was declining in 2014 and 2015. Based on his tax returns for those 2 years, a lower amount of temporary child support was reasonable under the circumstances and the district court did not abuse its discretion by declining to order an increased amount of temporary child support retroactively.

(b) Sunday and Holiday Parenting Time

*(i) Sunday Parenting Time*

In its decree, the district court ordered the following regular parenting time schedule:
[April] shall have parenting time with Luke from Tuesday at 5:00 p.m. to Sunday at 10:00 a.m. in Week 1; and from Tuesday at 5:00 p.m. to Thursday at 5:00 p.m. in Week 2. [Daniel] shall have parenting time with Luke from Sunday at 10:00 a.m. until Tuesday at 5:00 p.m. and on Thursday at 5:00 p.m. on Week 1 until Tuesday at 5:00 p.m. on Week 2. Continuing this two week schedule hereafter[.]

In her motion to alter or amend judgment, April argued "[her] Sunday end time should be 5:00 [p.m.], because under the Court's Decree, [Daniel] is awarded every single Sunday which is not a holiday, forever, and because this gives [Daniel] more than 50% of the parenting time[.]" In its order on the motion to alter or amend, the district court granted April's request "to the extent [her] parenting time shall be extended to 4:00 p.m. on Sundays"; and the subsequent nunc pro tunc decree of paternity reflected the change.

On cross-appeal, April argues that the district court erred when it granted Daniel one extra hour of parenting time each week by directing that the transition time occur at 4 p.m. rather than at 5 p.m. on Sundays. Daniel argues that the award of one extra hour of parenting time is not an abuse of discretion. We agree. Although the district court did not state its reasons for extending the Sunday parenting to 4 p.m., rather than 5 p.m. as requested by April, we can find no abuse of discretion in the district court's decision.

*(ii) Holiday Parenting Time*

The district court established a holiday parenting plan wherein Luke would spend Christmas, Easter, Fourth of July, Halloween, and his birthday with April in even-numbered years and Daniel in odd-numbered years. And Luke would spend Thanksgiving, New Year's, Memorial Day, and Labor Day with Daniel in even-numbered years and April in odd-numbered years. According to the decree, this schedule had apparently been in effect since November 2016 (prior to the trial in this case).

In her motion to alter or amend the judgment, April requested that the district court "adopt her holiday alternation because only that schedule can be made to be in harmony with the parties' other children's schedules." The district court denied April's request for a change.

On cross-appeal, April argues that Luke's holiday parenting schedule presents a "conflict where Luke will spend half of the holidays without seeing either of his half-brothers." Brief for appellee on cross-appeal at 33.

April and Daniel each have one older son from previous relationships. April testified that she asked her older son's father to "flip around" their child's holiday schedule to accommodate this case, but he said no. April stated, "[H]e is engaged, and their holidays are synchronized right now. He can't change his without sacrificing the two stepchildren that will be moving into [their son's] life in the summer." However, April testified that she has had communication with the mother of Daniel's older son about trying to change her holiday schedule "to synchronize all three boys" so that Luke can be with each of his half brothers for every holiday. April suggested a holiday plan that would be compatible with her older son's schedule because, according to her, the mother of Daniel's older son committed that she would sign a plan that's compatible with that schedule.

Although April testified that the mother of Daniel's older son would be willing to change her holiday parenting schedule with Daniel, April did not call the woman as a witness, nor did April offer the woman's affidavit. The district court, and this court on a de novo review, would have to take April at her word that the mother of Daniel's older son was willing to make a change since no other evidence was presented. Given the lack of evidence, we cannot say the district court abused its discretion when it set forth the holiday parenting plan and denied April's request to alter the plan. The fact that Luke may not get to spend every holiday with his stepbrothers is an unfortunate side effect of broken parental relationships, especially when multiple family units are involved. Certainly, there is nothing preventing the parties from agreeing to periodic changes in the parenting schedule to allow Luke to enjoy spending time with his half siblings on both sides of his family.

## VI. CONCLUSION

For the reasons set for above, we affirm the district court's nunc pro tunc decree of paternity.

AFFIRMED.